COURT OF APPEALS OF VIRGINIA

Present:   Judges Humphreys, Malveaux and Fulton
Argued at Fredericksburg, Virginia


DOMINIQUE DERICK HINTON

MEMORANDUM OPINION* BY
v.        Record No. 1034-22-4        JUDGE JUNIUS P. FULTON, III
SEPTEMBER 5, 2023

COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF WARREN COUNTY
Dennis L. Hupp, Judge Designate

Caleb J. Routhier (Miller, Earle & Shanks, PLLC, on briefs), for
appellant.

Ken J. Baldassari, Assistant Attorney General (Jason S. Miyares,
Attorney General, on brief), for appellee.


In a bench trial, the trial court convicted Dominique Derick Hinton for two counts of

distributing drugs as an accommodation and two counts of possessing drugs with the intent to

distribute as a second or subsequent offense. The trial court sentenced Hinton to a total of 18

years of imprisonment with 12 years suspended. Hinton argues that the trial court erred in

refusing to dismiss the indictments because the prosecution violated his right to due process,

denying his defense of entrapment, rejecting his accommodation defense for two of the offenses,

imposing an unlawful sentence, denying him his right to a preliminary hearing, and denying his

motion to suppress his statement to the police. For the reasons that follow, we affirm the trial

court's judgment.

---

* This opinion is not designated for publication. *See* Code § 17.1-413(A).

BACKGROUND

"In accordance with familiar principles of appellate review, the facts will be stated in the light most favorable to the Commonwealth, the prevailing party [below]." *Poole v. Commonwealth*, 73 Va. App. 357, 360 (2021) (quoting *Gerald v. Commonwealth*, 295 Va. 469, 472 (2018)). In doing so, we discard any of Hinton's conflicting evidence, and regard as true all credible evidence favorable to the Commonwealth and all inferences that may reasonably be drawn from that evidence. *Gerald*, 295 Va. at 473.

Hinton became friends with Dayon Stewart while they were both in prison in 2012. At that time, Hinton was serving a sentence for possessing heroin and cocaine with the intent to distribute. Hinton was released from prison in 2016.

In late July of 2018, Special Agent Tony Fox of the Virginia State Police began working with Stewart as a confidential informant investigating the distribution of illegal drugs. Under a written "Cooperating Individual Agreement" with the police, Stewart provided Agent Fox with a list of people who sold drugs to be potential targets of investigation. Hinton was not on the list, but Stewart eventually identified Hinton as a target. Agent Fox stated that he was "pretty hard" on the informants he worked with and tried to get them to produce results by completing undercover drug transactions. Stewart told Agent Fox that while in prison he and Hinton talked about selling drugs together once they were released.

After his release from prison, Hinton had no contact with Stewart until Stewart called him in August 2018. On August 5 or 6, 2018, while working as a confidential informant with the police, Stewart called Hinton using Facebook Messenger. Stewart claimed that he had been robbed of $18,000 and needed Hinton's help. Stewart said he had a drug habit and needed "some" and that he had no money. At trial, Hinton claimed to have responded that he no longer sold drugs, but sold

- 2 -

only marijuana.[1]  Stewart asked Hinton to bring drugs from his home in Richmond to Stewart's location in Warren County.  Stewart suggested that Hinton contact dealers he knew in Richmond to get drugs.  Hinton said that Stewart could come to Richmond for drugs, but Stewart said he had no money to travel.  Hinton replied that he could not help as he had a one-month-old daughter.  During the call, the baby's mother grabbed Hinton's phone and cursed Stewart.  Before ending the call, Hinton said he would help Stewart get drugs if he could get to Richmond.

Hinton testified that he ignored about six incoming calls from Stewart in the next week, when his son was born.  When Hinton accepted a call from Stewart on August 10, Stewart said that he could not get a ride to Richmond.  Hinton offered to send him some money, but Stewart refused and again asked Hinton to come to Warren County.  Hinton said he was busy working and that he then had two infant children.  Stewart got angry and mentioned he had "hommies," meaning fellow gang members, in Richmond, which Hinton perceived as a threat.[2]  The statement angered Hinton, who responded that he also had "the people too," but did not frighten him, and Stewart apologized.  Stewart then suggested that Hinton travel to Warren County on his way to the MGM casino, which Hinton visited frequently.  Hinton indicated he was not planning a trip to MGM for several weeks due to the recent birth of his son, but that he would bring Stewart some drugs on his next trip if Stewart's situation had not improved by then.

In a Facebook Messenger call a few days later, Stewart asked Hinton to bring his children with him when he traveled to Warren County, but Hinton refused.  Stewart called Hinton a few more times, and they discussed Hinton's family life and what days of the week he did not work.  Stewart asserted that he still had not found anyone to help him get money or drugs.

---

[1] Hinton testified that in August 2018 he was "heavily involved with marijuana," but that he had given up his ongoing business of selling other drugs before his infant daughter was born.

[2] Stewart was associated with the Gangster Disciple gang while in prison.

On August 20, 2018, the police obtained a capias for Stewart's arrest for drug offenses allegedly committed in January 2018. The indictment was sealed, and, with the Commonwealth's Attorney's permission, the capias was not served upon Stewart immediately.

When Stewart called Hinton on August 27, 2018, Hinton agreed to bring Stewart some drugs to sell during one of the next days he was off work and on his way to MGM; Hinton indicated that, after visiting the casino, he would return to Warren County and collect the money that Stewart would make from selling the drugs so that Hinton could repay the drug suppliers. Stewart said that he needed Hinton to package the drugs himself because Stewart had a drug habit. Stewart claimed that Hinton could make some money too because of the prices the drugs would garner in Warren County. After Hinton agreed, Stewart said he would use his last $90 for a hotel room for the operation. Stewart then provided Hinton with a phone number so they could communicate without Facebook Messenger. Stewart agreed to pay $400 to whomever Hinton found to drive him to Warren County.

In a recorded phone call with Stewart on August 28, 2018, Hinton asked what quantity of drugs he should bring.[3] Stewart suggested that Hinton bring at least a "half" of both cocaine and heroin because business was going to be "booming."

Hinton obtained $2,100 worth of drugs that were fronted from his suppliers in Richmond, including 14 grams of both heroin and crack cocaine as Stewart had suggested, and transported it to Warren County. Some powder cocaine was mixed in with the crack cocaine. Using the phone number Stewart provided, Hinton and Stewart exchanged text messages and calls on August 28, 2018, while Hinton was on the way to Warren County. Hinton said that he needed a scale because he forgot to bring one.

---

[3] Agent Fox listened to some of the phone calls between Stewart and Hinton, but the agent was not present for all of them. However, he recorded the calls for which he was present.

Stewart met Hinton at a Warren County motel room that, unbeknownst to Hinton, had been rented by the Virginia State Police. At the desk in the room, Hinton "started bagging up the heroin." Hinton's activity in the room was video recorded. Stewart said he had a client waiting outside the room to purchase $50 worth of heroin and $50 worth of cocaine, so Hinton prepared two packages of drugs and gave them to Stewart. Stewart gave a signal to the police and left the room as Hinton continued to package the drugs. The police charged into the room and arrested Hinton.

Immediately thereafter, Agent Fox initiated a conversation with Hinton in the motel room located next door to the room where Hinton had packaged the drugs. At a suppression hearing, Agent Fox testified that before any questioning began, he advised Hinton of his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966). As he customarily did, Agent Fox used a preprinted card to advise Hinton of his rights. Hinton "agreed verbally and he motioned his head yes" that he would talk to Agent Fox. Agent Fox thought he was recording the interview from the beginning but discovered after two or three minutes that he had failed to activate his recorder. Upon this discovery, which occurred after he advised Hinton of his *Miranda* rights, Agent Fox then "hit record."[4]

In the ensuing conversation, the agent stated that if Hinton was willing to identify his drug supplier, he "might let [Hinton] go free." To deflect suspicion that Stewart was working with the police as an informant, Agent Fox falsely said that Stewart "had been roughed up pretty bad" by the police. At first, Hinton denied that he was there to sell drugs, but after Agent Fox showed him the video recording of him in the room with the drugs before the police entered, he "confessed to everything." Hinton admitted that he sold heroin, but said he did not usually sell cocaine. Hinton told Agent Fox about the specific quantities of heroin and cocaine that he brought with him from

---

[4] In the report he filed concerning the incident, Agent Fox noted that he advised Hinton of his *Miranda* rights at 7:22 p.m.

Richmond and discussed the prices he typically charged for the drugs. He identified his supplier as "G." Hinton turned over his phone and provided the passcode for it.

The police seized both cocaine and heroin, a scale, and packaging materials from the motel room and from Stewart. The weight of the heroin, which was mixed with fentanyl, was between 18 and 19 grams, or about 38 individual doses. The weight of the cocaine was more than 12 grams. Hinton testified, "[M]y intentions was [sic] not to make a profit but I ended up coming to make a profit because of my involvement in it and how much that I got to actually do." He stated that he was "a small-time dealer in Richmond that only sells to a handful of people." Hinton admitted having five prior felony convictions.

Agent Fox testified that he did not know whether Stewart was using drugs when he was serving as an informant. Nor did the agent have any knowledge that Stewart violated the terms of his contract with the police as an informant. According to Agent Fox, Stewart was a productive informant and did good work for the police.

Initially, the police charged Hinton with possessing cocaine and heroin with the intent to distribute as a subsequent offense, possessing cocaine, and possessing Adderall with regard to the events on August 28, 2018. On April 15, 2019, before a preliminary hearing on the original charges, a grand jury indicted Hinton for distributing cocaine and heroin as a subsequent offense on August 28, 2018. On April 17, 2019, the original charges of possessing cocaine and heroin with the intent to distribute as a subsequent offense on August 28, 2018, as well as possessing cocaine and Adderall, were nolle prossed in the general district court. In June 2019, a grand jury indicted Hinton for possessing cocaine and heroin with the intent to distribute on August 28, 2018.

The trial court denied Hinton's motion to dismiss the April 2019 indictments on grounds that he was denied his statutory right to a preliminary hearing on the original charges. The trial

court reasoned that the distribution charges for which Hinton was indicted on April 15, 2019, were different than the possession charges that were nolle prossed on April 17, 2019.

At the conclusion of a bench trial, the court rejected Hinton's entrapment defense and found that he distributed the two $50 packages of cocaine and heroin to Stewart as an accommodation. In addition, the trial court convicted Hinton of possessing with the intent to distribute the heroin and cocaine found in the motel room. This appeal followed.

ANALYSIS

I. Due Process Claim

Hinton argues that the trial court erred in refusing to quash the indictments against him because of "the government's and informant's egregious conduct" that resulted in a violation of his right to due process. Hinton points to the apparent wide latitude that Stewart was afforded by the police while operating as an informant. He asserts that Stewart, working as a police informant, set up the details for the August 28, 2018 transaction through contacts with Hinton that were unsupervised by the police. Hinton claims that Stewart was using drugs when he was working as an informant, a violation of his written agreement with the police. In addition, Hinton maintains the police ignored the requirement that they arrest Stewart "forthwith" upon the outstanding warrant for his arrest by having the indictments sealed until after he concluded a transaction involving Hinton. "[W]hether a defendant's due process rights are violated . . . is a question of law, to which we apply a de novo standard of review." *Price v. Commonwealth*, 72 Va. App. 474, 488 n.5 (2020) (second alteration in original) (quoting *Henderson v. Commonwealth*, 285 Va. 318, 329 (2013)).

In advancing his argument, Hinton relies upon the decision of the Supreme Court of the United States in *United States v. Russell*, 411 U.S. 423 (1973). In *Russell*, a criminal defendant argued that the police engaged in outrageous conduct where an undercover agent supplied narcotics manufacturers with a legal, but difficult to obtain, chemical that was essential to the

methamphetamine manufacturing process. *Id.* at 431. The Court rejected the defendant's due process claim, but stated that there may "some day" be "a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction." *Id.* at 431-32.

Subsequent to *Russell*, the Court reconsidered the application of an "outrageous conduct" due process violation in *Hampton v. United States*, 425 U.S. 484 (1976) (plurality opinion). The plurality of the Court observed that "[t]he limitations of the Due Process Clause of the Fifth Amendment come into play only when the Government activity in question violates some protected right of the [*d*]*efendant*." *Id.* at 490 (emphasis added).

The United States Court of Appeals for the Fourth Circuit has stated that "[a]fter *Hampton*, the 'outrageous conduct' doctrine survives in theory, but is highly circumscribed." *United States v. Hasan*, 718 F.3d 338, 343 (4th Cir. 2013); *see also United States v. Jones*, 13 F.3d 100, 104 (4th Cir. 1993) (noting "the doctrine is moribund; in practice, courts have rejected its application with almost monotonous regularity" (quoting *United States v. Santana*, 6 F.3d 1, 4 (1st Cir. 1993))). The doctrine applies only to conduct that "is outrageous, not merely offensive." *Hasan*, 718 F.3d at 343 (quoting *United States v. Goodwin*, 854 F.2d 33, 37 (4th Cir. 1988)). In other words, "the conduct must be 'shocking,' or 'offensive to traditional notions of fundamental fairness.'" *Id.* (quoting *United States v. Osborne*, 935 F.2d 32, 37 (4th Cir. 1991)). Moreover, "[o]utrageous is not a label properly applied to conduct because it is a sting or reverse sting operation involving contraband." *Id.* at 344 (alteration in original) (quoting *Goodwin*, 854 F.2d at 37).

Hinton cites no opinion of a Virginia appellate court, and we are aware of none, finding conduct by government agents was so "outrageous" as to violate due process, and given the type of conduct necessary to establish the violation, this will not be the first. The facts and

circumstances presented in this case were not so outrageous or egregious that law enforcement should be barred from obtaining a conviction against Hinton. We find no basis to conclude that any of Hinton's claims about the conduct of Stewart or police officers before the August 28, 2018, incident was "shocking" or "offensive to traditional notions" of fairness. *See id.* Hinton did not allege a specific violation of his protected rights during the undercover drug operation, nor do we perceive any. *See Jones*, 13 F.3d at 104 ("As a practical matter, only those claims [of outrageous conduct] alleging violation of particular constitutional guarantees are likely to succeed."). We thus conclude that Hinton's claim of a due process violation is without merit, and we do not further consider it.

## II. Entrapment

Hinton argues that the trial court erred in rejecting his defense of entrapment as a matter of law. Entrapment is an affirmative defense. *See McCoy v. Commonwealth*, 9 Va. App. 227, 234 (1989). "In Virginia, a criminal defendant typically bears the burden of 'producing evidence in support of [an affirmative defense] sufficient to raise a reasonable doubt of [his or her] guilt." *Williams v. Commonwealth*, 57 Va. App. 341, 352 (2010) (alterations in original) (quoting *Tart v. Commonwealth*, 52 Va. App. 272, 276 (2008)). In a bench trial, "the trial judge assumes the role of the jury in deciding whether entrapment has occurred. Accordingly, his factual findings are entitled to the same weight as that accorded a jury verdict and will not be disturbed on appeal unless plainly wrong or without evidence to support them." *Schneider v. Commonwealth*, 230 Va. 379, 382 (1985).

"Entrapment is the conception and planning of an offense by a police agent, and his or her procurement of its commission by 'one who would not have perpetrated it except for the trickery, persuasion, or fraud' of the police." *Howard v. Commonwealth*, 17 Va. App. 288, 293 (1993) (quoting *Schneider*, 230 Va. at 381). "[W]hen the criminal design originates in the mind

of the accused and, thereafter, the Commonwealth does no more than afford an opportunity for the commission of the crime, the defense of entrapment does not lie." *Cogdill v. Commonwealth*, 219 Va. 272, 279 (1978). "Encouragement or solicitation of the commission of a crime," or influencing the nature or degree of the crime, "by one who is willing and predisposed to commit the crime does not constitute entrapment." *McCoy*, 9 Va. App. at 232.

"[T]o determine whether entrapment has been established, a line must be drawn between the trap for the unwary innocent and the trap for the unwary criminal." *Russell*, 411 U.S. at 429 (quoting *Sherman v. United States*, 356 U.S. 369, 372 (1958)). As the Virginia Supreme Court has found, "[t]here is nothing improper in the use, by the police, of decoys, undercover agents, and informers to invite the exposure of willing criminals and to present an opportunity to one willing to commit a crime." *Stamper v. Commonwealth*, 228 Va. 707, 715 (1985). "Where one is predisposed to commit a criminal act and involvement by a police informant influences the nature or degree of the crime, it cannot be said that the state provided an innocent person with the intent to commit a crime." *McCoy*, 9 Va. App. at 233. Thus, "[a] person ready and willing to engage in certain criminal activity cannot avail himself of an entrapment defense by claiming he was only willing to commit one type of crime but the Commonwealth entrapped him by encouraging him to commit a more serious crime of the same nature." *Id.* "Reluctance to engage in crime is not transformed into entrapment whenever a person hesitantly, but willingly, acquiesces in the request of a close ally to commit a crime." *Id.* at 232.

As the trial court recognized, Stewart, acting as a government agent, "procure[d] the commission of the crime by trickery, persuasion or fraud" by "l[ying] to . . . Hinton about his having been robbed and his needing money and he, of course, embarked on a campaign to enlist his help." Employing the test laid out in *Howard*, where we held that police "trickery, persuasion, or fraud" only results in entrapment where the person who commits the crime

"would not have perpetrated it" absent said coercion by the police or their agent, the second inquiry in which the trial court engaged was whether Hinton was "predisposed to commit the crime." Hinton was released from prison in 2016 after serving an eight-year sentence for possession with the intent to distribute cocaine and heroin convictions. He resumed dealing heroin and cocaine upon his release from prison. Despite Hinton's claims at trial to have ceased selling any drug other than marijuana in the months prior to this offense, Hinton admitted to Agent Fox that he was a narcotics dealer and typically sold heroin. When Stewart initially contacted Hinton, Hinton agreed to connect Stewart with drug sources he knew in Richmond. After Stewart said he could not travel to Richmond, Hinton agreed to bring drugs to Stewart on his next trip to the MGM casino. Upon agreeing on a date and location, Hinton did exactly as he promised and, without assistance from Stewart, obtained, on his own credit, both heroin and cocaine from his contacts in Richmond. He met Stewart in Warren County for the express purpose of packaging the drugs, selling them, and making money, and indeed Hinton "was actually bagging the drugs up when the law enforcement came into the motel room." The facts and circumstances on this record thus support the trial court's conclusion that Hinton was predisposed to engage in illegal narcotics activity, and the trial court did not err in rejecting his entrapment defense.

### III. Accommodation

Hinton asserts that the trial court erred in refusing to find that he possessed the cocaine and heroin in the motel room with the intent to distribute as an accommodation. As pertinent here, under Code § 18.2-248(D), if a defendant proves that he possessed drugs with the intent to distribute "only as an accommodation to another individual" and "not with intent to profit thereby from any consideration received or expected," then "he shall be guilty of a Class 5 felony." "[A] defendant who invokes an accommodation defense has the burden of proving the elements of that defense

- 11 -

by a preponderance of the evidence." *Heacock v. Commonwealth*, 228 Va. 397, 406 (1984); *see also Winston v. Commonwealth*, 16 Va. App. 901, 905 (1993). "An accommodation defense . . . pertains only to the penalty imposed on one found guilty of" the drug offense. *Foster v. Commonwealth*, 38 Va. App. 549, 555 (2002). The Supreme Court of Virginia has construed the term "profit" as "a commercial transaction in which there is a consideration involved. It does not necessarily mean that a seller of drugs has to sell his drugs to a buyer at a price in excess of the amount the seller paid for the drugs." *Hudspith v. Commonwealth*, 17 Va. App. 136, 138 (1993) (quoting *King v. Commonwealth*, 219 Va. 171, 174 (1978)).

The evidence proved that Hinton obtained heroin and cocaine in Richmond and brought the drugs to Stewart in Warren County to facilitate the sale to Stewart's clients in exchange for money. Hinton participated in the plan with the expectation that he and Stewart would receive money and that Hinton would return some of that money to the suppliers in Richmond who had fronted the drugs to him. Hinton testified at trial that although his initial "intention[] was not to make a profit[,] . . . [he] ended up coming to make a profit." Even if Hinton did not expect to profit personally in the operation, he believed there would be "a commercial transaction in which there [wa]s a consideration involved," and the trial court did not err in finding that the drugs he possessed in the motel room were not merely to accommodate Stewart.

## IV. Sentencing

Hinton contends that the imposition of sentence for the distribution of drugs as an accommodation offenses violated the "doctrine" of *United States v. Palafox*, 764 F.2d 558 (9th Cir. 1985) (en banc), which held that where the defendant "distributes a sample [of drugs] and retains the remainder for the purpose of making an immediate distribution to the same recipients at the same place and at the same time, verdicts of guilty may be returned on both counts but the

defendant may be punished on only one." *Id.* at 560 (reviewing the defendant's sentences for convictions under 21 U.S.C § 841, the Comprehensive Drug Abuse Prevention and Control Act).

All four of Hinton's convictions arose from violations of the same statute, Code § 18.2-248. Although Hinton does not raise a double jeopardy claim per se, we note that "[i]n the simultaneous-prosecution context, the prohibition against double jeopardy protects against 'multiple punishments for the same offense.'" *Severance v. Commonwealth*, 295 Va. 564, 572 (2018) (quoting *Commonwealth v. Gregg*, 295 Va. 293, 298 (2018)). "We review de novo claims that multiple punishments have been imposed for the same offense." *Lawlor v. Commonwealth*, 285 Va. 187, 227 (2013).

In *Palafox*, the defendant was charged and convicted of one count of distribution of a controlled substance and one count of possession with the intent to distribute a controlled substance, "stem[ming] from a meeting in a parking lot where Palafox intended to sell a package of heroin to an undercover agent. The agent asked Palafox for a sample of the heroin, took a small quantity from the package[,] and returned the package to Palafox." 764 F.2d at 559. Only a single sale of drugs was contemplated, and "the meeting with the agent, the giving of the sample[,] and the possession of the remainder were all directed toward consummation of one criminal undertaking." *Id.* at 563. In *Meyers v. Commonwealth*, 12 Va. App. 398, 400 (1991), the only Virginia appellate decision considering *Palafox*, we "assum[ed] without deciding that *Palafox* accurately describes Virginia law." Nonetheless, we stated that "[t]he *Palafox* doctrine is narrow in its application," and has "no application to circumstances . . . where the quantity of drugs remaining in the possession of the seller is greater than the amount involved in the agreed transaction and the evidence establishes that the excess amount is possessed with the intent to distribute." *Id.* at 401-02.

Even assuming arguendo that Virginia law is consistent with *Palafox*, the factual circumstances in this case place it outside its narrow application. Hinton distributed a quantity of

heroin and cocaine to Stewart, who then left the motel room ostensibly to deliver the drugs to an awaiting client. Hinton remained in the room with the remaining quantities of heroin and cocaine, which he continued to prepare for distribution to other purchasers as Stewart had told him that business would be "booming." In contrast to *Palafox*, here Hinton and Stewart planned multiple sales to numerous purchasers and the heroin and cocaine Hinton distributed to Stewart were not samples but the first of many sales contemplated by Hinton. The remainder in Hinton's possession was intended for additional sales, and thus the distribution and possession with the intent to distribute offenses were not part of a single criminal undertaking but rather were distinct offenses. Just as *Meyers* found that *Palafox* had no application to its factual circumstances, we find the factual circumstances of the criminal enterprise that Hinton consented to undertake with Stewart also place his case outside application of whatever consideration the *Palafox* "doctrine" might offer in mitigation of the sentences for the distribution as accommodation offenses.

## V. Denial of Preliminary Hearing

In the trial court, Hinton moved to dismiss the two distribution offenses charged by indictment on April 15, 2019, contending that he was entitled to a preliminary hearing upon the original charges that were brought by warrant in August 2018 but nolle prossed on April 17, 2019. Hinton cited Code § 19.2-218, which provides that "[n]o person who is arrested on a charge of felony shall be denied a preliminary hearing upon the question of whether there is reasonable ground to believe that he committed the offense," and "no indictment shall be returned in a court of record against any such person prior to such hearing unless such hearing is waived in writing by the accused." The trial court denied Hinton's motion to dismiss, concluding that the April indictments, which charged him with distribution offenses, were not the same as the possession of drugs with the intent to distribute charges that were nolle prossed.

- 14 -

Hinton appears to advance a distinct argument on appeal that relates to the June 2019 indictments rather than the April 2019 indictments. Hinton asserts, "Claiming that the charges which were refiled in June 2019 in the Warren County Circuit Court were different charges than those which were filed in August 2018 in the Warren County General District Court is mere sophistry." He maintains that the trial court "erred by denying [him] his right to a preliminary hearing" and that, as a consequence, the June 2019 indictments should be dismissed.

"No ruling of the trial court . . . will be considered as a basis for reversal unless an objection was stated with reasonable certainty at the time of the ruling, except for good cause shown or to enable this Court to attain the ends of justice." Rule 5A:18. "One of the tenets of Virginia's jurisprudence is that trial counsel must timely object with sufficient specificity to an alleged error at trial to preserve that error for appellate review." *Perry v. Commonwealth*, 58 Va. App. 655, 666 (2011). "The purpose of th[e] contemporaneous objection requirement [in Rule 5A:18] is to allow the trial court a fair opportunity to resolve the issue at trial, thereby preventing unnecessary appeals and retrials." *Creamer v. Commonwealth*, 64 Va. App. 185, 195 (2015). "Specificity and timeliness undergird the contemporaneous-objection rule, animate its highly practical purpose, and allow the rule to resonate with simplicity." *Bethea v. Commonwealth*, 297 Va. 730, 743 (2019). "Not just any objection will do. It must be both *specific* and *timely* — so that the trial judge would know the particular point being made in time to do something about it." *Id.* (quoting *Dickerson v. Commonwealth*, 58 Va. App. 351, 356 (2011)). If a party fails to timely and specifically object, he waives his argument on appeal. *Arrington v. Commonwealth*, 53 Va. App. 635, 641 (2009).

The argument Hinton raises on appeal is not the same claim that he raised in his motion to dismiss in the trial court. Accordingly, the issue is waived and we will not consider it. Hinton does not invoke the good cause or ends of justice exceptions to Rule 5A:18, and the Court will not

apply the exceptions sua sponte. *Edwards v. Commonwealth*, 41 Va. App. 752, 761 (2003) (en banc).

### VI. Motion to Suppress Statements

Hinton, in a pretrial motion, sought to suppress his statements to the police and any evidence that the police obtained as a result of his statements. He maintained that the police subjected him to custodial interrogation without first advising him of his *Miranda* rights. "The principle is now well-established that, pursuant to the Fifth Amendment of the United States Constitution, law enforcement officers must inform a suspect in a custodial interrogation of certain rights, including the right to remain silent and to have the assistance and presence of legal counsel during the interrogation." *Bass v. Commonwealth*, 70 Va. App. 522, 539-40 (2019) (quoting *Stevens v. Commonwealth*, 283 Va. 296, 302 (2012)). "In reviewing the denial of a motion to suppress, we 'consider the facts in the light most favorable to the Commonwealth, the prevailing party at trial.'" *Aponte v. Commonwealth*, 68 Va. App. 146, 156 (2017) (quoting *Hairston v. Commonwealth*, 67 Va. App. 552, 560 (2017)). "It is the appellant's burden to show that when viewing the evidence in such a manner, the trial court committed reversible error." *Id.* (quoting *Hairston*, 67 Va. App. at 560).

Hinton did not testify or provide any evidence at the suppression hearing that he was not given the prerequisite *Miranda* warnings. The trial court denied the motion to suppress, finding that the *Miranda* warning was given and that Hinton waived it. At trial, Hinton testified that the police did not read him his *Miranda* rights until after the interview ended and just before he was placed in a police car. Notwithstanding Hinton's assertions to the contrary, the trial court was not required to accept his testimony as truthful, and nevertheless, Hinton has failed to properly preserve the issue for our consideration. "When considering whether to affirm the denial of a pretrial suppression motion, an appellate court reviews not only the evidence presented at the pretrial hearing but also

- 16 -

the evidence later presented at trial." *Commonwealth v. White*, 293 Va. 411, 414 (2017). "In contrast, as an appellate basis for *reversing* a criminal conviction based on an erroneous pretrial ruling, evidence at trial becomes relevant only if the defendant renews his pretrial motion at trial." *Id.* at 414 n.2 (emphasis added). "Only in doing so does an appellant satisfy Rule [5A:18] by inviting the trial court to reconsider its pretrial ruling in light of the actual evidence presented." *Id.* Hinton did not renew his motion to suppress in light of his trial testimony.

Hinton asserts on appeal that the recording of his interview with Agent Fox did not include a recitation of his *Miranda* rights. Nonetheless, the evidence was uncontroverted at the suppression hearing that Agent Fox advised Hinton of the *Miranda* warnings before questioning began, Hinton waived his rights, and he chose to speak to the officer. Agent Fox testified that, using a preprinted card and consistent with his usual practice, he read Hinton the *Miranda* warnings before asking him any questions. Hinton agreed to speak with Agent Fox. Agent Fox explained that after the advisement he discovered that he had failed to start the recorder and "hit record." In the interview that followed, Agent Fox imposed no compulsion for Hinton to confess.

"[W]hether a waiver of *Miranda* rights was made knowingly and intelligently is a question of fact, and the trial court's resolution of that question is entitled on appeal to a presumption of correctness." *Overbey v. Commonwealth*, 65 Va. App. 636, 649 (2015) (alteration in original) (quoting *Harrison v. Commonwealth*, 244 Va. 576, 581 (1992)). In light of the clear testimony at the suppression hearing, and Hinton's failure to renew his motion in light of his testimony at trial, we find no basis to disturb the trial court's decision that Agent Fox

properly advised Hinton of his *Miranda* rights before questioning and he chose to waive them.

Therefore, the trial court did not err in denying the motion to suppress.[5]

CONCLUSION

For the foregoing reasons, we affirm the judgment of the trial court.

*Affirmed.*

---

[5] Because we do not disturb the trial court's denial of the motion to suppress Hinton's statements, we need not consider his contentions that, as the fruit of a poisonous tree, the police unlawfully obtained the passcode to his phone during the interrogation and, thus, the information recovered from the phone should have been suppressed.